# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
| ) | |
| v.      ) | **No. 10 CR 763** |
| ) | |
| ) | **Judge Ruben Castillo** |
| VERDELL SIMMONS.      ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Verdell Simmons ("Simmons") is charged with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). (R. 1, Indictment.) Presently before the Court is Simmons' motion to suppress all evidence seized as a result of a search of 604 North Trumbull, Chicago (the "Trumbull residence"), and Simmons on January 13, 2000, and any fruits of that search. (R. 25, Def.'s Mot.) The Court held an evidentiary hearing on March 4, 2010. (R. 30.) Pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the Court now states its findings of fact and conclusions of law. For the reasons stated below, Simmons' motion is granted.

# RELEVANT FACTS[1]

On January 13, 2010, Chicago Police Department ("CPD") officers executed a search at the Trumbull residence. As a result of the search, CPD officers seized two guns, ammunition, suspected drugs, money, Simmons' Illinois ID card, clothing, and keys. The CPD officers located the guns in a suitcase in a rear utility closet. Following the search, CPD officers arrested Simmons and a woman who lived at that address. Simmons was charged with one count of being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1).

The search of Simmons and the Trumbull residence was executed pursuant to a warrant issued the morning of the search. The source of the allegations in the complaint in support of the warrant was a confidential informant (the "CI"), known as "John Doe." The CI had been arrested the previous day, January 12, 2010, for solicitation of unlawful business by CPD Officers John Murphy ("Officer Murphy") and Thomas Hanrahan ("Officer Hanrahan"). Officers Murphy and Hanrahan heard the CI shout "blows," the street term for heroin, and found a small medicine bottle containing suspected heroin in the area where the CI was arrested. However, because they had not seen the CI with the drugs or found him in possession of the drugs, the officers felt that they could "not put the drugs on" the CI. Nevertheless, they took the CI into custody in the

---

[1] These facts are drawn from the testimony of Chicago Police Department Officer John Murphy at the evidentiary hearing on March 4, 2010, to the extent the Court found Officer Murphy credible (R. 30); the warrant (R. 27, Def.'s Mot., Ex. A); the complaint for the search warrant (*id.*, Ex. B); investigation reports by the Bureau of Alcohol, Tobacco, Firearms and Explosives including interviews with the officers involved in the development of the complaint (*id.*, Ex. C); the arrest report for the confidential informant in this case (*id.*, Ex. D); and undisputed facts provided in Simmons' motion to suppress (*id.*). *See United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("a judge presiding at a suppression hearing may receive and consider any relevant evidence" and the "judge here properly relied on facts set out in police report . . . where defendant made no motion to strike and adduced no evidence that impeached or contradicted the account in the report").

hopes of obtaining information from him.

After Officers Murphy and Hanrahan placed the CI in their unmarked police car, they asked the CI if there was anything he could do "to get himself out of the situation he was in." While the officers had no intention of charging the CI, they told him they had found the suspected heroin, and the CI believed he would be charged with possession of drugs. With that potential charge hanging over his head, the CI asked what kind of information the officers were looking for. The officers told him they were looking for drugs and guns, drug houses, or people involved in illegal activity. The CI began to offer information, and was driven to the Eleventh District Police Station where the questioning continued.

There are some discrepancies about the CI's initial offer of information to the police. In an interview with federal agents subsequent to the search, Officer Murphy said that the CI stated he could identify a drug house, and later identified the Trumbull residence as a drug house. At the hearing, Officer Murphy stated the CI did not say he could identify a drug house, but rather a house in which he had seen a firearm. The Court finds that some combination of the two versions, both told by Officer Murphy, is what actually happened. When prompted to provide information, the CI—believing he was facing drug charges—likely made promises to provide information on a whole host of illegal activity, including drug houses and the existence of a gun in the Trumbull residence. The lack of a clear record regarding the discussions between the CI and the officers also results from the fact that Officer Murphy destroyed his notes after the warrant was issued, and thus the only document indicating the content of the discussions is the complaint used in support of the warrant.

According to the complaint, the CI told Officer Murphy that he was an "acquaintance" of Simmons, and had visited him on January 10, 2010, at the Trumbull residence. During this alleged visit, the CI claims he saw Simmons pull out a blue steel handgun from underneath a couch in the front room, and place it in the waistband of his pants. According to the CI, Simmons said that he kept the gun for protection against the Traveling Vice Lords (a rival street gang) "from Chicago and Trumbull."

Following the CI's "conversation" with the officers, Officer Murphy undertook the following investigative steps. First, Officer Murphy obtained a photograph of the Trumbull residence building from the Cook County Assessor's website and showed it to the CI, who stated that was where Simmons lived. Second, the CI was driven past the Trumbull residence, which the CI identified as Simmons' residence. Third, Officer Murphy obtained a photograph of Simmons from the "CPD Data Warehouse," which the CI identified as Simmons. Finally, Officer Murphy ran an arrest history for Simmons, which revealed a felony conviction. At some point in the preparation of the complaint, Officer Murphy also ran the CI's criminal history, which included multiple arrests and convictions, including convictions for unlawful possession of a weapon by a felon, aggravated unlawful use of a weapon, possession of a controlled substance, and solicitation of unlawful business. The record also indicated the CI's gang affiliation and that he had used aliases in connection with previous arrests.[2]

Officer Murphy next typed up the complaint. In doing so, he tried to get the "whole story," selected what he believed was "relevant," and then composed a summary of the details

_____

[2] The government has not turned over the CI's record to Simmons, but has made these representations regarding the CI's record to Simmons in the course of discovery.

and the events. He then went over the details of the complaint with the CI, who was locked to a

bench outside of the tactical office where Officer Murphy was working on the complaint.

The next morning, Officer Murphy and the CI appeared before Judge David A. Skyrd

("Judge Skyrd" or the "issuing judge"), a branch court misdemeanor judge who is located in the

police facility, to swear out the complaint for a warrant.[3] The complaint for the warrant, which

was signed by Officer Murphy and the CI, stated that:

> Complainant says that he has probable cause to believe, based upon the following
> facts, that [[a]ny handguns, ammunition and documents showing residency] are now
> located upon [Verdell Simmons] and [604 N. Trumbull, first floor residence of a
> brick two flat building, Chicago, Cook County, Illinois]:
>
> I, P.O. Murphy #3297, have been a Chicago Police Officer for the past nine years and
> am currently assigned to the 011th District Tactical Unit. On 12 Jan 10, I had a
> conversation with a subject that will now be referred to as J. Doe. On this date, J.
> Doe related that as recently as 10 Jan 10, J. Doe went to 604 N. Trumbull 1st floor
> apartment of a brick two flat building to visit with Verdell Simmons. J. Doe is an
> acquaintance of Verdell Simmons. J. Doe related to R.O. that during this visit [with]
> Verdell Simmons he observed Verdell Simmons reach beneath a couch in the front
> room of the apartment, retrieve a blue steel semi-automatic handgun and place the
> weapon in his waistband. J. Doe stated that he knew the handgun was real because
> he is familiar with handguns and has handled handguns in the past. J. Doe further
> related to R.O. that Verdell Simmons told J. Doe that he is at war with traveling vice
> lords from Chicago and Trumbull and he has the weapon with him in case the
> travelers come to his house and start a war. I, P.O. J. Murphy, showed J. Doe a
> picture of the residence located at 604 N. Trumbull that was obtained through the
> Cook County Assessors web site, at which time J. Doe positively identified the
> location as the residence of Verdell Simmons. P.O. Mcgrory #9730 then drove J.
> Doe past 604 N. Trumbull at which time J. Doe pointed to 604 N. Trumbull and
> stated, "that is where Verdell lives." P.O. J. Murphy also showed J. Doe pictures of
> Verdell Simmons that were obtained through the CPD Data Warehouse at which time
> J. Doe positively identified the pictures as pictures of Verdell Simmons. R.O.
> performed an arrest history of Verdell Simmons which revealed a conviction for a
> felony under case number 07CR2075001. Based on this information, the affiants

---

[3] While the name of the judge on the warrant is not legible, Officer Murphy recalled the name of
the judge in a subsequent interview with federal agents when an agent read off the names of
Cook County Circuit judges.

believe that there is sufficient information for the issuance of a search warrant for Verdell Simmons IR1266526 and the premises of 604 N. Trumbull 1st floor apartment, Chicago, Cook County, Illinois.

Although the CI was present at the swearing of the complaint, Judge Skyrd asked very few, if any, questions. Officer Murphy had previously told federal agents that Judge Skyrd had asked him and the CI "multiple questions concerning their knowledge of the target, the target location, and the time frame that the informant either observed or participated in activities at the target location." However, at the hearing, Officer Murphy recharacterized that statement as pertaining to what judges "typically" ask, and he could not recall a single question asked by Judge Skyrd when they went to swear the complaint in this case. Judge Skyrd did not inquire into the CI's criminal history, gang affiliation, whether the CI had given the information in connection with his own arrest, or whether the CI had previously been an informant.

Judge Skyrd concluded that the facts on the complaint were sufficient to show probable cause, and issued the warrant for the search of both Simmons and the first-floor apartment at the address on Trumbull for "any handguns, ammunition and documents showing residency." The search was executed later that day. The CI subsequently pled guilty to solicitation of unlawful business, and was given a sentence of time served—two days.

Simmons now claims that the warrant underlying the search violated his Fourth and Fourteenth Amendment rights because the complaint submitted in support of the search warrant omitted material facts that diminished the CI's credibility. (R. 25, Def.'s Mot. at 2.) Specifically, Simmons contends that the officers omitted the fact that the allegations in the complaint were based on the claims of a first-time confidential informant of unknown reliability, who was under arrest at the time he gave the statement, and had an extensive criminal history

6

that included lying to the police. (*Id.*)

## LEGAL STANDARD

In ruling on a motion to suppress evidence recovered pursuant to a search warrant, a court must give "considerable weight" to the issuing judge's determination and should "uphold a finding of probable cause to search 'so long as the magistrate had a substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010) (quoting *Ill. v. Gates*, 462 U.S. 213, 236 (1983)). The issuing judge should be overruled only when "the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the [issuing judge] could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. Wiley*, 475 F.3d 908, 915 (7th Cir. 2007) (quoting *United States v. Newsom*, 402 F.3d 780, 782 (7th Cir. 2005)). Even "doubtful cases are to be resolved in favor of upholding the warrant." *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) (quoting *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992)).

Although the Court presumes the validity of a warrant and the information offered to support it, "this presumption is premised on an 'assumption . . . that there will be a *truthful* showing' of probable cause." *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (citing *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978)). In *Franks*, the Supreme Court observed that Fourth Amendment protections would be meaningless if materially false warrant affidavits or complaints could go unchallenged:

> Because it is the magistrate who must determine independently whether there is
> probable cause, it would be an unthinkable imposition upon his authority if a warrant
> affidavit, revealed after the fact to contain a deliberately or recklessly false statement,

7

were to stand beyond impeachment.

438 U.S. at 165 (citations omitted).

Consequently, the Supreme Court held that the presumption of validity of a warrant is overcome if the party challenging the warrant establishes by the preponderance of the evidence that the officer who sought the warrant made a false statement "knowingly or intentionally, or with reckless disregard for the truth," and that the false statement is "necessary to the finding of probable cause." *Id.* at 156. The Seventh Circuit has also held that the presumption gives way to "evidence showing that the officer intentionally or recklessly withheld material facts from the warrant-issuing judge." *Whitlock*, 596 F.3d at 410-11 (citing *United States v. Sims*, 551 F.3d 640, 645 (7th Cir. 2008)). In extending the *Franks* holding to omissions, courts have noted that the same danger is created by the omission of material facts as the inclusion of false facts in a warrant application:

> If the government had unfettered power to pick and choose which facts to present to the magistrate regardless of how misleading the presentations were, the magistrate's review of the affidavit would be rendered meaningless. The magistrate would not be provided with a fair opportunity to review the government's evidence in making the probable cause determination. He would perform his crucial role at the whim, caprice or duplicity of the governmental agents involved in the case.

*United States v. Dorfman*, 542 F. Supp. 345, 367 (N.D. Ill. 1982) (citing cases extending *Franks* to material omissions), *aff'd sub nom. United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) (affirming that the rationale of *Franks* applies to material omissions). If the party challenging the warrant meets the burden set forth in *Franks*, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

8

## ANALYSIS

Under the principles of *Franks*, only the omission of material facts from the complaint in support of the warrant will result in the suppression of evidence. *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990), *overruled on other grounds, United States v. Westmoreland*, 240 F.3d 618, 632-33 (7th Cir. 2001). The Seventh Circuit tests the materiality of omitted facts under the standard established by the Supreme Court in *Franks* for false statements. *Id.* (citing *Williams*, 737 F.2d at 604). First, the defendant must prove that the omission "amounts to deliberate falsehood or reckless disregard for the truth." *Id.* Second, the Court must determine whether the complaint's contents—with the addition of the omitted material facts—are sufficient to establish probable cause. *United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008) (citations omitted).

## I.      Intentional or Reckless Omission

Simmons points to three facts that detract from the CI's reliability that Officer Murphy omitted from the complaint. First, the complaint omits the fact that the CI was a first-time, untested informant. (R. 25, Def.'s Mot. at 1.) Second, the complaint gives no indication that the CI was arrested the previous day, and was in custody when he gave the statement and swore the complaint. (*Id.* at 4.) Finally, there is no mention of the CI's gang affiliation or criminal background, which includes providing aliases to the police when previously arrested and multiple convictions for gun and drug offenses. (*Id.*) It is clear from the exhibits in support of Simmons' motion to suppress that Officer Murphy did not include these facts. Proof of omitted facts is not enough, however. Simmons must also prove by the preponderance of the evidence that the omissions were intentional or reckless.

The Seventh Circuit has held that "the standard of reckless disregard for the truth used in evaluating a challenge to a search warrant under *Franks* is analogous to the standard used in the context of First Amendment cases involving libel articulated by the Supreme Court in the landmark case of *New York Times Co., v. Sullivan*[.]" *United States v. A Residence Located at 218 Third St., New Glarus, Wis.*, 805 F.2d 256, 258 (7th Cir. 1986). Thus, an officer acts with reckless disregard for the truth where he "in fact entertained serious doubts as to the truth of his allegations" or if "proved inferentially . . . that [the] affiant had obvious reasons to doubt the veracity of the information he received." *Id.* In the case of omissions, in order "to prove deliberate falsehood or reckless disregard," the defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts." *McNeese*, 901 F.2d at 594 (citing *Residence Located at 218 Third St.*, 805 F.2d at 259). Inferential evidence includes circumstances in which the omitted facts are so "critical" to the probable cause determination that the inference is compelling. *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) ("Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination") (citing *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990); *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990)); *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007).

In this case, while there is no direct evidence of Officer Murphy's intent to mislead the issuing judge, the inferential evidence leads to the conclusion that the omissions were material because Officer Murphy had "obvious reasons" for omitting the information, and the information was "critical" to the probable cause determination. As an initial matter, Officer Murphy was clearly aware that the CI was recently arrested, had an extensive criminal history, and was

untested as an informant. During the evidentiary hearing, he testified that he ran the CI's criminal record and saw the CI's criminal history, any gang affiliations, and that the CI had used aliases in the past. He also had never previously worked with the CI, and had no indications that the CI had provided reliable information in the past. However, the Court concludes that Officer Murphy omitted any reference to any of these facts because of their potentially adverse impact on the issuing judge's probable cause determination. While the omission of these facts would not be "critical" in a case in which there was other evidence to support probable cause, in this case, given the weak police corroboration of the CI's statement and the absence of any other indicia of reliability of the CI and his statement, the omission of these facts was material.

The Court easily concludes that Officer Murphy had "obvious reasons" to omit the adverse facts. The reliability and credibility of information in a warrant application are essential to a judge's probable cause determination, and the omitted facts strongly detract from the reliability of the CI—the sole source of the inculpatory information in the complaint. It is well-established that a newly-arrested informant "merits a greater dose of skepticism when assessing his credibility." *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005). However, the complaint gave no indication to the issuing judge that the CI provided the information regarding Simmons immediately after his arrest and in the hopes of "getting himself out of the situation he was in." Similarly, the CI's extensive criminal history, including providing aliases to the police when arrested in the past, obviously would have negatively impacted the issuing judge's determination regarding the CI's credibility. *See Crivens v. Roth*, 172 F.3d 991, 998 (7th Cir. 1999) (granting habeas petition because the state failed to provide the defendant with the criminal records of the state's witness at trial because, in part, "[the witness's] use of aliases as

they related to [his prior] convictions could have damaged his credibility in the eyes of the state trial court. By assuming new identities, [the witness] has demonstrated a propensity to lie to police officers, prosecutors, and even judges").

Importantly, the lack of other indicia of reliability in this case makes these facts particularly "critical" to the probable cause determination. As discussed in more detail below, the CI's statement was sparsely detailed and police corroboration of the statement was minimal; thus, the inclusion of facts indicating that the CI was not reliable would likely be fatal to the application for the warrant. In cases in which the police similarly omitted one of these facts, courts have upheld the warrants despite the omission only when there were detailed statements by the informants, significant corroboration by the police, or other indicators regarding the informant's reliability—none of which are present here. *See, e.g., United States v. Singleton*, 125 F.3d 1097, 1103-04 (7th Cir. 1997) (omission of informant's criminal history, that informant was on disability because of mental retardation and was a former mental patient suffering from mental illness from affidavit "of little consequence" where there was "independent, often contemporaneous, police corroboration," including audio corroboration of informant's controlled buys); *United States v. Huggins*, 299 F.3d 1039, 1046 (9th Cir. 2002) ("failure to disclose that the informant was in custody and trying to secure a plea bargain" not a material omission in light of significant police corroboration of the informant's statement and fact that "the affidavit did state, forthrightly, that the reliability of the informant was untested"); *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir. 1987) (omission of informant's criminal record and fact that informant was in custody did not invalidate warrant because the affidavit detailed prior use of informant on at least 14 occasions over 12 years). Here, the government argues that Officer

12

Murphy took several steps to corroborate the CI's statement. As discussed below, those actions were insufficient given the circumstances in this case. Moreover, "even if there were some degree of corroboration, this does not excuse omission of known unreliability. The magistrate judge must be given the opportunity to assess the 'totality of the circumstances.'" *United States v. Vigeant*, 176 F.3d 565, 574 n.9 (1st Cir. 1999) (citation omitted) (holding that the omission of "the CI's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability" not excused by presence of independently corroborating information).

While the omission of each individual fact may not necessarily lead to the conclusion that Officer Murphy acted with reckless disregard for the truth, the cumulative effect of all of the omissions was to eliminate nearly every indicator detracting from the CI's reliability. There was nothing left to put the issuing judge on notice of the omitted facts. *Cf. United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002) (omission of named informant's criminal history not material where "affidavit informed the magistrate that [the informant] had admitted to using methamphetamine and purchasing ingredients for manufacturing methamphetamine and was in possession of equipment that could be used for manufacturing methamphetamine," and the police corroborated parts of informant's story); *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir. 2002) (omission of informant's criminal history not material because magistrate was informed informant had used and sold cocaine, and informant had provided reliable information on ten previous occasions); *United States v. Hanhardt*, 157 F. Supp. 2d 978, 994-95 (N.D. Ill. 2001) (omission of "full criminal histories" of the named and confidential informants from the affidavit not misleading where agent "disclosed enough of the criminal histories . . . to give sufficient insight into their backgrounds for the court to weigh the reliability of their information").

13

The government contends that the CI's statement regarding his past familiarity with handguns would put the issuing judge on notice "that the CI possibly was someone with a checkered past." (R. 27, Gov't Resp. at 6 n.6.) The Court finds this argument unconvincing. A statement about the CI's past handling of handguns says nothing about his current arrest or current gang affiliation. Nor does it provide any indication of the full extent of the CI's criminal history, including lying to the police. Additionally, Officer Murphy had the knowledge that the CI actually—not possibly—had a "checkered past." The proper way to put the judge on notice was to indicate at least the existence of that history on the complaint, not to expect a busy state criminal branch court judge to read into a tangentially related statement the possibility that the CI had relevant criminal history. And the government points to nothing in the complaint, and provides no additional evidence from the CI's appearance before the issuing judge, that would indicate to the judge that the CI was arrested the night before the swearing of the complaint.

The misleading nature of these omissions was compounded by what Officer Murphy did include in the complaint. Specifically, Officer Murphy stated that on January 12, 2010, he "had a conversation with a subject." The Court does not believe that the use of "conversation" and "subject" was merely poor word choice. Rather, Officer Murphy knew that the issuing judge would find an "arrestee" or "gang member" less reliable than someone labeled innocuously as a "subject." *Cf. United States v. Elkins*, 300 F.3d 638, 651 (6th Cir. 2002) (reference to what in fact was an anonymous tip as from a "confidential informant" was false and reckless because it is "readily familiar to police officers" that "tips from known informants have more value than those from unknown ones"). The use of "subject" also gave no indication of the background of the CI or his current circumstances. *Cf. United States v. Jarding*, No. 01 CR 818, 2002 WL 1905533, at

14

*6 (N.D. Ill. Aug. 19, 2002) (omission of confidential informant's criminal history not material because the application labeled the informant as a street gang member, "and it is relatively apparent to any reader familiar with the criminal justice system, including, of course, [the issuing judge]—that he therefore was likely to be regularly engaged in criminal activity"). The use of "conversation" is similarly misleading. Officer Murphy did not obtain the information during a conversation with a concerned citizen, or even an informant with a criminal history who voluntarily went to the police with information. Instead, the CI provided the information while under arrest in the back of a police car, and later, while locked to a bench in the police station.

Officer Murphy testified at the hearing that he did not include the CI's criminal history or the fact that the CI was under arrest because no "state's attorneys or judges" have asked him to include that information in the past. Additionally, Officer Murphy said he wanted to protect the confidentiality of the informant, stating, "the way I feel is he's an anonymous tipster. The more I add in there about his criminal history, the more likely the target of the search warrant would figure out who's giving me the information."

The Court does not find these excuses credible. Officer Murphy cannot place the blame for these omissions elsewhere when he knew that the judge would rely upon the complaint to determine probable cause, and that the reliability of a confidential informant would be a key factor in that determination because of the weak corroborating circumstances. Officer Murphy stated that his process for drafting a complaint was to get the "whole story" and then only include the "relevant" information. He did not need a state's attorney or judge to tell him that the omitted information in this case—the CI's criminal history, recent arrest, and untested reliability—was relevant to the issuing judge's probable cause determination. Any failure to

15

train Officer Murphy on these matters is unfortunate and does not excuse the recklessly misleading application for a search warrant that was undertaken in this case.

Nor can Officer Murphy claim that he omitted all of the information to protect the CI. The Court recognizes that the privilege to withhold information to protect the safety of an informant is well-established. *See, e.g., United States v. Danovaro*, 877 F.2d 583, 587-88 (7th Cir. 1989) (deliberate exclusion of details to protect an informant in an application for a wiretap permissible, as long as the information is not essential to support the warrant). However, this privilege is not a blank check for police officers to unilaterally decide that all information pertaining to a confidential informant can be omitted from a complaint, especially when that information weighs against the finding of probable cause. Instead, officers can only omit what is necessary to protect the identity of the informant. *Rovario v. United States*, 353 U.S. 53, 60 (1957) ("The scope of the [informer's] privilege is limited by its underlying purpose. Thus, where the disclosure . . . will not tend to reveal the identity of an informer, the contents are not privileged."). In this case, the extent to which Officer Murphy withheld details went far beyond what was necessary to protect the CI. While it would be unreasonable to expect Officer Murphy to have described in detail every aspect of the CI's background in the complaint, his failure to mention that the CI had any criminal background or was under arrest at the time of the statement was in reckless disregard for the truth. Unfortunately, the reality in Chicago is that the description of "a first-time informant who is a recently arrested gang member with a criminal record that includes lying to the police" would not have compromised the CI's identity in any

way,[4] but may have led Judge Skyrd to deny the search warrant application or demand further verification of the CI's information.

Accordingly, the Court concludes that Officer Murphy acted with reckless disregard for the truth in omitting that the CI was an untested arrestee with a relevant criminal history. The Court recognizes that police officers must pick and choose the information that is presented in a warrant application, and "[w]e cannot demand that police officers relate the entire history of events leading up to a warrant application with every evocative detail that would interest a novelist or a gossip." *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). However, at the same time, "if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know,'" then there is a reasonable inference that the officer acted with reckless disregard for the truth. *Id.* at 787-88 (citation omitted).[5] In this case, Officer Murphy was reckless in omitting from the complaint information that "was clearly 'critical' to the probable cause determination." *See Rivera*, 928 F.2d at 604. The Court now turns to second part of the "material omission" inquiry, the probable cause determination.

## II. Probable Cause

---

[4] This conclusion is also supported by the fact that the government has refused to turn over the CI's unredacted criminal record to Simmons, but has provided some description of the CI's criminal history.

[5] The Court recognizes that the Third Circuit's holding that "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known was the kind of thing the judge would wish to know" sounds somewhat like a negligence standard, which does not meet the *Franks* standard for "reckless disregard of the law." *Franks*, 438 U.S. at 171. Thus, while the fulfillment of that criterion alone would be insufficient to establish recklessness, the Court finds it reasonable to take into account that the omitted facts are ones that an officer would know the issuing judge would rely upon to make his or her probable cause determination.

In addition to establishing that Officer Murphy's omissions were intentional or reckless, Simmons must also prove that the omissions were material to the probable cause determination. These omissions were material only if the inclusion of the CI's criminal history, the fact that he was an untested, first-time informant, and that he was under arrest when he provided the statement to the police "would have negated probable cause." *Whitlock*, 596 F.3d at 411. Thus, the Court must inquire as to "whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Robinson*, 546 F.3d at 888 (citations omitted). In this case, an examination of the hypothetical complaint does not support a finding of probable cause.

Probable cause for a search warrant exists when: "(1) [] it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises when the warrant is issued." *United States v. Grubbs*, 547 U.S. 90, 96 (2006). Probable cause is "a common-sense, nontechnical inquiry, and an affidavit submitted in support of a search-warrant application will be sufficient to support a probable-cause finding if 'based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *Dismuke*, 593 F.3d at 586.

In this case, the information in the complaint pertaining to Simmons was provided by the CI. When an informant supplies the information relied upon for the warrant, "the totality-of-the-circumstances inquiry generally focuses on the informant's reliability, veracity, and basis of knowledge." *Id.* at 586-87 (citing *Olson*, 408 F.3d at 370). The Seventh Circuit has identified several factors relevant to the analysis, including: "(1) the degree of police corroboration of the informant's information; (2) the extent to which the information is based on the informant's personal observations; (3) the amount of detail provided by the informant; (4) the interval of time

18

between the events reported by the informant and the warrant application; and (5) whether the informant personally appeared before the warrant-issuing judge to present the affidavit or testimony." *Id.* at 587 (citing *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002)). "No one factor is dispositive, so a deficiency in some areas can be compensated by a stronger showing in others." *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009) (citations omitted).

As an initial matter regarding the reliability of the CI, Simmons emphasizes that the CI in this case was a first-time, untested informant. Indeed, the record shows that the CPD officers had never previously worked with or met the CI. However, the CI's lack of "a history of accurate information from the informant in question" is not fatal to the reliability determination. *See United States v. McIntire*, 516 F.3d 576, 579 (7th Cir. 2008). Rather, "[s]tatements from an informant of unknown reliability may in certain instances serve to establish probable cause if, under the totality of the circumstances, a reasonable person might consider that the statements are worthy of credence." *Koerth*, 312 F.3d at 867-68 (citing *Gates*, 462 U.S. at 238).

Here, with the inclusion of the omitted information, the totality of the circumstances establishes that there is not sufficient evidence to find that probable cause supported the warrant. First, the post-arrest context in which the CI provided his statement, his criminal history that raises significant doubts about his credibility, and the sparsely-detailed statement he provided to the officers indicate that the CI's statement was not "worthy of credence." Second, the officers here took only minimal steps to corroborate the innocent details of the CI's statement. Finally, while the live testimony of a confidential informant before the issuing judge may sometimes cure these insufficient indicators of reliability, in this case, the issuing judge was not apprised of key facts pertaining to the CI, and thus was unable to adequately gauge his credibility. The Court

discusses each of these factors in turn, beginning with the CI's statement.

## A. The CI's Statement

Before discussing the specifics of the CI's statement, the Court notes that the context in which the CI proffered the information—directly following his arrest—raises red flags. The CI did not voluntarily go to the police with the information contained in the complaint. Nor had the police worked with him previously. Nor was he a named informant. Instead, the CI was an unknown, newly-arrested informant, "and as such merits a greater dose of skepticism when assessing his credibility." *Olson*, 408 F.3d at 370; *see also* Wayne R. LeFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3(c), 136 (4th ed. 2004) ("It is fair to say, therefore, that there is much more reason to conclude that veracity is shown when the informant comes forward as an affiant or when is identity is disclosed in the affidavit or upon the motion to suppress.") (footnotes excluded).

As discussed above, the CI was arrested on January 12, 2010 when Officers Murphy and Hanrahan observed him allegedly attempting to sell heroin. When the officers placed the CI in the police car, they told him they were looking for information on drugs and guns, and asked if there was anything he could do to get "himself out of this situation." The CI here obviously believed that the officers were offering to improve his "situation" in exchange for information. While "[a] motive to curry favor . . . does not necessarily render an informant unreliable," *Olson*, 408 F.3d at 371, it is a factor that is highly relevant to the analysis of the reliability of an informant's statement. It is true that "even informants 'attempt[ing] to strike a bargain with the police [have] a strong incentive to provide accurate and specific information rather than false information about [a defendant's] illegal activity.'" *Id.* (quoting *Koerth*, 312 F.3d at 870.) The

situation, however, still merits increased skepticism on the part of the officers and the issuing judge, especially where, as here, there was a clear offer of a *quid pro quo*. While the officers did not make an explicit promise to help the CI if he provided information, that the CI would have such an expectation is reasonable given the circumstances. And, in fact, the CI received a sentence of time served—two days—when he pled guilty.

In addition to the questionable circumstances in which the CI provided the information to the police, the CI's prior interactions with the police do not indicate that he would be a reliable source. As mentioned above, Officer Murphy ran the CI's record before the complaint was sworn. According to Simmons' motion, "the government has represented that the CI has used aliases in connection with previous arrests, and that the CI has multiple arrests and convictions, including convictions for unlawful possession of a weapon by a felon, aggravated unlawful use of a weapon, possession of a controlled substance, and solicitation of unlawful business." (R. 25, Def.'s Mot. at 4.) With no history of accurate cooperation in the past, the only evidence of the CI's reliability—or lack thereof—before Officer Murphy was documented incidents of the CI having provided false information to the police in the past when arrested. The issuing judge, however, made the probable cause determination without knowing about the CI's criminal history because Officer Murphy did not include this information on the complaint.

Next, moving to the statement the CI gave Officer Murphy, the Court finds it lacking in detail. In many ways, the complaint in this case mirrors that of the affidavit provided to the issuing judge in *Dismuke*. 593 F.3d at 587. In *Dismuke*, "the informant told [the police officer] that he had personally and recently seen [the defendant] in possession of three guns in his home; he provided an exact address; and he described the guns as a shotgun and two pistols." *Id.* The

Seventh Circuit found that the affidavit "establishes that informant's information was current and based on personal observation, but the level of detail and corroboration are not well-developed . . . These basic details provide at least *some* indicia of reliability. But the affidavit gave the warrant-issuing court commissioner no additional particularized fact about the informant's observations." *Id.*

Here, the CI said he had personally and recently seen Simmons in possession of a gun in his home and described the gun as a "blue steel semi-automatic handgun." (R. 25, Def.'s Mot., Ex. B at 416.) He also provided the additional information that the gun had been located "beneath a couch in the front room of the apartment," and that Simmons' reason for possessing a gun was the threat of violence from the Traveling Vice Lords. (*Id.*) Like the affidavit in *Dismuke*, these details were allegedly based on the CI's first-hand observations of Simmons three days prior to the issuance of the warrant. The detailed description of the gun, as well as the statement regarding Simmons' fear of "war" with the Traveling Vice Lords, also give the statement, in theory, "*some* indicia of reliability." *See Dismuke*, 593 F.3d at 587. The statement, however, provides little specific information regarding the CI and his visit with Simmons at the North Trumbull residence. The complaint only states that the CI was "an acquaintance of Verdell Simmons." (*Id.*) There is no explanation as to how the CI knew Simmons, or why he was with Simmons on January 10, 2010.

The Court also notes that the CI's statement regarding Simmons did not inculpate the CI in any way. In *Olson*, the informant had recently been arrested, and thus merited "a greater dose of skepticism." 408 F.3d at 371. However, the statement he provided to the police that led to a search warrant of the defendant's home had exposed the CI as more culpable than originally

expected. *Id.* In this case, the government points to the CI's acknowledgment that he "knew the handgun was real because he is familiar with handguns and has handled handguns in the past" as a statement against interest. (R. 27, Gov't Resp. at 2.) The Court disagrees. This statement is innocuous and could be a reference to the fact that the CI was a gun enthusiast or even a military veteran. The CI's criminal record truly reveals his past familiarity with guns, and thus a general statement admitting his "past" handling of guns would not expose him to any criminal liability.

In sum, all of the circumstances surrounding the CI's statement and the statement itself justify heightened skepticism regarding the truthfulness of the information used to obtain the warrant. Not only was the CI an unknown informant who had sought to extricate himself from police custody with falsehoods in the past, but he cooperated because the drugs obtained in his recent arrest were being held over his head. Moreover, the sparsely-detailed statement the CI provided suggests that the statement was merely a fabrication on the part of the CI who was seeking to avoid a drug possession charge. These deficiencies, however, can be overcome through police corroboration, to which the Court now turns.

**B.    Police Corroboration of the CI's Allegations**

"In [the situation of an informant of unknown reliability], the extent to which the police have corroborated the informant's information—always an important factor—is key." *Dismuke*, 593 F.3d at 587 (citation omitted). Simmons argues that the steps taken by the officers to verify the CI's statement were insufficient in this case because he was an unknown informant, had a history of giving false information to the police, and provided the statement after recently being arrested.

As discussed above, the steps taken by CPD officers to corroborate the CI's information

were: (1) obtaining a photograph of the building at the Trumbull address from the Cook County Assessor's website and showing it to the CI; (2) driving the CI past the building at the Trumbull address, where the CI identified it as the building "where Verdell lives"; (3) obtaining a photograph of Simmons from the "CPD Data Warehouse," which the CI identified as Simmons; and (4) confirming Simmons had a felony conviction.

Simmons rightly highlights several deficiencies in the officers' attempts to corroborate the CI's statement. (R. 25, Def.'s Mot. at 7-8.) First, nearly all of the corroboration involved the CI—not an independent source—verifying information provided to him by the police. For example, the CI did not provide a physical description of Simmons or the two-flat residence at Trumbull that the officers could verify themselves. Additionally, rather than confirming that Simmons lived at the Trumbull residence through a vehicle registration search or conducting surveillance of the apartment, the officers relied upon the CI's own confirmation of the information he provided. Simmons also points out that the CI's confirmation of the information resulted from suggestive identification procedures. (*Id.* at 5.) For the CI's identification of both the Trumbull residence and Simmons, the officers showed the CI only a single photo, not a less suggestive photo array. Finally, aside from confirming the CI's knowledge of firearms, the officers' other efforts corroborated only Simmons' identity and the fact that the informant correctly identified Simmons' residence. "Accuracy on these innocent facts is important but does not directly bolster the informant's claim that [Simmons] illegally possessed guns at his home." *Dismuke*, 593 F.3d at 587-88.

The government acknowledges that additional steps could have been taken in this case, but correctly notes that the fact that Simmons can point to things the officers could have done to

corroborate the CI's statement, but did not do, does not in any way detract from what was done. *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000). The government argues that the steps taken by the officers are sufficient to corroborate the CI's statement by drawing comparisons between this case and *United States v. Waltower*, No. 08-CR-186, 2009 WL 1543833, at *1 (N.D. Ill. June 1, 2009). In *Waltower*, the police corroborated the informant's statement in the same ways as the officers here, except for driving past the defendant's house. *Id.* While these steps were sufficient in *Waltower*, the comparison fails to acknowledge that probable cause is determined by the totality of the circumstances, and the sufficiency of "what was done" by police officers to corroborate an informant's statement cannot be viewed isolation. Rather, as discussed above, the amount of corroboration necessary depends on other facts, including the background of the informant and the context in which the information is provided. *See Koerth*, 312 F.3d at 867-68. In *Waltower*, the informant voluntarily contacted the police with the information and provided a detailed statement, including the physical description of the defendant and the layout of the defendant's residence. *Id.* at *1-2. The corroboration in *Waltower* was sufficient because other circumstances—the voluntariness and specificity of the informant's statement—lent greater reliability to the informant and the information he provided. In this case, however, given the CI's background, the threat of criminal charges he faced, and the less-than-detailed statement he provided, the officers' corroboration was insufficient to verify the information in the CI's statement.

## C. The CI's Appearance before the Issuing Judge

The final factor the Court will consider in evaluating the probable cause determination is the appearance of the CI before the issuing judge. While the personal appearance of a

confidential informant is not a cure-all for an otherwise deficient complaint, "when a CI accompanies the officer and is available to give testimony before the judge issuing the warrant, his presence adds to the reliability of the information used to obtain the warrant, because it provides the judge with an opportunity to assess the informant's credibility and allay any concerns he might have had about the veracity of the informant's statements." *United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995) (citations omitted).

The government claims that because the CI appeared before the issuing judge, the judge could "allay any concerns he might have had." (R. 27, Gov't Resp. at 9.) In this case, however, the complaint did not include that the CI was a first-time informant, the CI's criminal history or gang affiliation, or that the CI had been arrested the previous day, so the judge had no reason to "allay" any concerns by questioning the CI. Additionally, while it may be common practice for some judges to ask questions relevant to an informant's credibility, here there is no evidence that the issuing judge asked any questions about: the CI's criminal background, the context in which the CI provided the information to the police, or if the CI had worked with the police before.

This case is very similar to *United States v. Hall*, 113 F.3d 157 (9th Cir. 1997). In *Hall*, a drug dealer was arrested after a controlled buy, and the troopers found significant quantities of cash in his work locker, cocaine in his car, and cocaine dealing equipment in his home. *Id.* at 157. Caught red-handed, the dealer told the troopers that his supplier was a man named "Ron," a heavyset male in his 60s, who drove a red and white pick-up truck, and lived in a trailer at space 56. *Id.* at 159. He also told the troopers that Ron hid his cocaine in cereal boxes and cut-out books. *Id.* The troopers drove with the dealer to the trailer park, where they spotted what the dealer said was Ron's red and white pick-up truck parking in space 56. *Id.* at 158. The police

checked the license plate on the truck, and confirmed that it belonged to a Ronald Hall. *Id.* The police and the dealer then went to the state magistrate, where they gave live testimony under oath. *Id.* The troopers, however, did not disclose to the magistrate judge "two criminal matters that went to the heart of the [dealer's] character and credibility, namely: the probation violation involving death threats to a wounded police officer, and the 1990 conviction for the offense of falsely reporting a crime." *Id.* The government conceded that the trooper involved recklessly failed to disclose all of the dealer's convictions during the search warrant hearing, and Ninth Circuit held that there was no probable cause to issue the warrant. *Id.* at 161. The court reasoned that there was "virtually no evidence at all without the informant's testimony," and that the dealer's previous false report to the police "suggested the possibility that he would lie to the police to frame an innocent man." *Id.* at 160. The government argued that the magistrate knew of the dealer's more serious crimes, and questioned him during the warrant hearing. *Id.* The court rejected that argument, saying:

> Issuance of a search warrant is not accomplished in an adversary proceeding. The state magistrate depended on the prosecutor and the trooper to present him with the truth, and to bring to his attention problems with their informant's credibility. He was misled . . . This information [about the dealer's false report] would doubtless have led to more skepticism and perhaps some questions had the magistrate known it.

*Id.* Thus, the court concluded, because the "government presented no evidence to the magistrate to suggest a probability that [Ron] Hall had narcotics in his trailer except the word of a man whom it knew had a substantial criminal record," there was no probable cause to issue the warrant. *Id.* at 161.

In this case, like in *Hall*, all of the inculpatory information indicating that Simmons

possessed a gun in the Trumbull residence came from a recently-arrested informant with a history

of lying to the police. Additionally, despite knowing little about the CI except that he was under

arrest and had lied to the police in the past, the police officers in this case corroborated only that

Simmons lived at the Trumbull residence—through confirmation by the CI himself—and that

Simmons had a previous conviction. Without relying on what the CI said, the only evidence

before the issuing judge was that Simmons had a prior conviction. Given these circumstances,

there was insufficient evidence to suggest a probability that Simmons possessed a gun at the

Trumbull residence, or even that Simmons resided at the address given by the CI. Thus, the

warrant for the search of the Trumbull residence and Simmons was not supported by probable

cause.

### D.    "Good Faith" Exception

When the Court finds that a warrant was not supported by probable cause, the Court's

inquiry usually turns to whether the disputed search nevertheless falls under the "good faith"

exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). "However,

the good faith exception to the warrant requirement does not apply in cases, such as here, where

the officer seeking the warrant was dishonest or reckless in preparing the affidavit." *United

States v. Harris*, 464 F.3d 733, 740 (7th Cir. 2006) (citing *United States v. Dumes*, 313 F.3d 372,

380-81 (7th Cir. 2002)); *Leon*, 468 U.S. at 923 ("Suppression therefore remains an appropriate

remedy if the magistrate or judge in issuing the warrant was misled by information in an affidavit

that the affiant knew was false or would have known was false except for his reckless disregard

for the truth.") (citing *Franks*, 438 U.S. at 154).

Because probable cause would have been lacking had the complaint included the omitted

material facts, the Court concludes that the evidence seized as a result of the search of the Trumbull residence and Simmons on January 13, 2010 must be suppressed. The Court does not reach this conclusion lightly, as the suppression of the seized evidence will likely result in the release of a probably guilty, and possibly dangerous, defendant. However, the ends cannot justify the means. The Constitution must not only be enforced when it is easy but also when it is hard—as in this case.

It is the Court's strong conclusion that the police conduct in this case was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *See Herring v. United States*, 129 S.Ct. 695, 702 (2009). Obviously, further training of CPD officers is necessary to avoid similar incidents in the future.

The harmful effects of guns on the streets of Chicago are sadly all too evident, and the Court commends the work of the many law enforcement agencies involved in combating this problem. The Court, however, cannot permit police officers to withhold material evidence from the very judges charged with making the probable cause determination.

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Payton v. New York*, 445 U.S. 573, 586 n.24 (1980) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (footnotes omitted)). Any other result would lead to a system that just encourages police officers to mislead busy state court judges to issue warrants and then claim "good faith" reliance on warrants issued in good faith by judges who have not assessed the

29

totality of the circumstances. The Fourth Amendment demands more.

## CONCLUSION

For the foregoing reasons, Simmons' motion to suppress (R. 25) is GRANTED.

Entered: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** March 22, 2011